87 F.3d 1537
 35 Fed.R.Serv.3d 1005, 29 UCC Rep.Serv.2d 1121,
96 Cal. Daily Op. Serv. 4450,
96 Daily Journal D.A.R. 7190
 Margaret LEWIS, Plaintiff-Appellant,
v.
TELEPHONE EMPLOYEES CREDIT UNION; Universal Savings Bank;
Bay View Federal Savings and Loan Association;
The Bank of America, Defendants-Appellees,
American Independent Bank; Willie Gillyard; Mahogany Check
Cashing; Defendants-cross-defendants Appellees,
City National Bank, Defendant-cross-claimant-Appellee.
Angus G. MacLEOD, as personal representative of the estate
of Jean P. MacLeod, Plaintiff-Appellant,
v.
Willie J. GILLYARD; Mahogany Check Cashing, Defendants-Appellees.
Angus G.S. MacLEOD, as personal representative of the estate
of Jean P. MacLeod, Plaintiff-Appellant,
v.
KODAMA-SCHULMAN, INC.; George Schulman; Doe Kodama; Doe
Oswalt; Doe 1 a/k/a "Ira Singerman"; Willie T. Gillyard;
Mahogany Check Cashing; American Independent Bank;
Glendale Federal Bank; Sumitomo Bank of California;
Federal Home Loan Bank, Defendants-Appellees.
 Nos. 94-56045, 94-56049 and 94-56077.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 11, 1996.
Decided June 20, 1996.
 
 Angus M. MacLeod, Wilke, Fleury, Hoffelt, Gould & Birney, Sacramento, California, for appellants.
 Greta T. Hutton, Knapp, Peterson & Clarke, Glendale, California, for Telephone Employees Credit Union.
 Kenneth R. Wachtel, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, San Francisco, California, for Sumitomo Bank of California.
 Jacob J. Stettin, Stettin and Cass, Los Angeles, California, for Universal Savings Bank and Bay View Federal Bank.
 Nancy R. Tragarz, Prenovost, Normandin, Bergh & Dawe, Santa Ana, California, for American Independent Bank.
 Jeffrey C. Briggs, Gibson, Dunn & Crutcher, Los Angeles, California, for Willie J. Gillyard & Mahogany Check Cashing.
 Stephen T. Hicklin, Howard, Everakes & Associates, Glendale, California, for Glendale Federal Bank.
 Gregory J. Hughes and Benjamin Webster, Pillsbury, Madison & Sutro, Sacramento, California, for Federal Home Loan Bank of San Francisco.
 Diane Wemple Baxa, Office of the General Counsel, Beverly Hills, California, for City National Bank.
 F. Thomas Eck, IV, Office of General Counsel, Los Angeles, California, for Bank of America.
 George Schulman, Kodama-Schulman, Inc., Newport Beach, California, in propria persona.
 Appeals from the United States District Court for the Central District of California, Manuel L. Real, Chief District Judge, Presiding. D.C. Nos. CV-93-06099-R, CV-94-02766-R and CV-93-05259-R.
 Before BRIGHT,* NORRIS, and WIGGINS, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 Two elderly women, Jean P. MacLeod and Margaret Lewis, were separately swindled out of hundreds of thousands of dollars by telephone fraud artists who persuaded the women to write numerous personal, cashier's, and teller's checks, purportedly for investment in valuable coins and gems. MacLeod's estate and Lewis each filed suit against the check cashing company that cashed most of the checks, the principals of a suspended corporation that received the proceeds of some of the checks, and several Doe defendants, charging them with RICO violations and fraud. Both plaintiffs also sued the banks that had sold, collected, or paid the checks, alleging, inter alia, breach of contract, breach of warranty, and conversion. The district court granted the banks' motions to dismiss under Fed.R.Civ.P. 12(b)(6). As a sanction for an alleged discovery violation, the district court excluded one of plaintiffs' important witnesses. The plaintiffs dismissed with prejudice their remaining claims against the remaining defendants so that they could immediately appeal the district court's exclusion of their witness.
 
 
 2
 MacLeod's estate and Lewis appeal the district court's dispositions in favor of the banks and the RICO and fraud defendants. We have jurisdiction under 28 U.S.C. § 1291 and affirm in part and reverse and remand in part.
 
 PLEADED FACTS
 
 3
 The facts are pleaded in the complaint as follows. In June 1992, Jean P. MacLeod, a 78-year-old woman, living alone in Long Beach, California, and suffering from incurable cancer, was contacted over the phone by a man who identified himself as "Ira Singerman." MacLeod was convinced by "Singerman" to make substantial investments in valuable coins. At his urging, MacLeod purchased 31 teller's checks totalling $241,400 from Glendale Federal Bank ("Glendale"), which were drawn on Glendale's account at Federal Home Loan Bank of San Francisco ("FHLB"). Twenty-nine of the checks were written in the name of a number of individuals who "Singerman" claimed would sell coins to MacLeod, and two of the checks were written to "Kodama-Schulman," purportedly "Singerman's" accountant. MacLeod also wrote seven personal checks totalling $101,066 to "Kodama-Schulman." MacLeod was directed by "Singerman" to turn the checks over to a messenger who came to her apartment. MacLeod never received any coins.
 
 
 4
 The personal checks and two teller's checks written to "Kodama-Schulman" were deposited in the account at Sumitomo Bank of California ("Sumitomo") of Kodama-Schulman, Inc., a suspended California corporation. None was indorsed by the payee, but eight of the nine were indorsed with bank-produced stamps indicating either that the proceeds were credited to the account of "Kodama/Oswalt/Schulman Inc," or the "within named payee." The ninth check, a personal check, had neither a payee's indorsement nor a bank supplied indorsement. The other twenty-nine teller's checks were indorsed with the names of the payees and cashed in Los Angeles at Mahogany Check-Cashing, owned by Willie Gillyard ("Gillyard"). All twenty-nine checks were deposited by Gillyard and credited to his account at American Independent Bank ("AIB"). AIB transferred the checks to FHLB, which paid the checks and debited Glendale's account at FHLB.
 
 
 5
 Margaret Lewis, an elderly woman living alone in Orange County, California, was convinced by a man calling himself "Larry Yeleti" to purchase twenty-nine cashier's and teller's checks worth a total of $130,776 made payable to "non-existent" individuals whose names were provided by "Yeleti" for investment in coins and jewels. Lewis purchased twenty-three cashier's checks from the Telephone Employees Credit Union ("TECU"), one cashier's check from Bank of America ("BofA"), three teller's checks from Universal Savings Banks ("Universal"), and two teller's checks from Bay View Savings Bank ("Bay View"). Each of the checks was indorsed with the names of the payee, cashed at Gillyard's place of business, deposited at AIB, and credited to Gillyard's account. Five of the checks were routed through City National Bank ("CNB") before being paid by the drawee banks. The remainder were transferred directly for payment from AIB to the drawee banks. Lewis received only "samples" of the coins and jewels, worth less than $50.
 
 PROCEDURAL HISTORY
 
 6
 In early 1993, MacLeod's family reported the swindle to the Long Beach Police. MacLeod died soon thereafter in March 1993. In June 1993, while the police investigation apparently proceeded slowly, MacLeod's estate ("the Estate") filed suit against Gillyard, Kodama-Schulman, Inc. and its principals, and several Doe defendants for RICO violations and fraud; against Sumitomo and Glendale for wrongful payment of the personal and teller's checks written to Kodama-Schulman; and against AIB, FHLB, and Glendale for wrongful payment and conversion of the other teller's checks. The police informed Jean MacLeod's nephew and counsel for the Estate, Angus MacLeod ("Attorney MacLeod"), of the similar swindle of Lewis. Lewis was given Attorney MacLeod's name by local police and she eventually became his client. In October 1993, Lewis filed suit against Gillyard, Kodama-Schulman, Inc. and its principals, and several Doe defendants for RICO violations and fraud; against TECU, Universal, BofA, and Bay View for breach of contract in the sale of teller's and cashier's checks; and against AIB and CNB for wrongful payment, breach of warranty and conversion.[1]
 
 
 7
 Disposition of the Claims Against the Bank Defendants
 
 
 8
 AIB filed a motion under Fed.R.Civ.P. 12(b)(6) to dismiss the Estate's claims against it on the grounds that MacLeod, as a remitter of the cashier's checks, had no standing to bring any claims arising out of payment of the checks and that AIB was a holder in due course. Sumitomo filed a 12(b)(6) motion to dismiss the Estate's claims against it on the grounds that it was a holder in due course of the checks it paid and that the intended payee had received the proceeds of the checks deposited in Kodama-Schulman, Inc.'s account with Sumitomo. Glendale joined both motions. In November 1993, the district court, without stating its reasoning, granted the motions to dismiss on behalf of all three parties. After the district court denied the Estate's motion for reconsideration, the claims against FHLB were dismissed by stipulation in February 1994.
 
 
 9
 In Lewis's case, Bay View and Universal filed a joint 12(b)(6) motion, relying in large part on the district court's grant of AIB's similar motion in the MacLeod case, and also arguing that Lewis lacked standing to bring claims arising out of payment of the cashier's checks and that the banks were not liable for payment of checks written to a fictitious person. AIB and TECU filed similar 12(b)(6) motions to dismiss Lewis's claims against them, and BofA joined AIB's motion. In January and February 1994, the district court granted the motions to dismiss on behalf of Bay View, Universal, AIB, TECU, and BofA, specifically stating that Lewis did not have standing to bring her claim against AIB, BofA, and TECU. In April 1994, the claims against CNB were dismissed by stipulation.
 
 
 10
 Disposition of the Claims Against the Fraud Defendants
 
 
 11
 Detectives Ross Smillie and Leonard Gaeta of the Long Beach Police Department began investigating the swindle of MacLeod in early 1993. As a result of perceived inconsistencies between the detectives' interview of Gillyard in April 1993 and Gillyard's deposition in September 1993, Attorney MacLeod decided to call Smillie as a witness in the plaintiffs' cases to impeach Gillyard and to testify as an expert about the similarity between MacLeod's and Lewis's cases. Officer Smillie was also encouraged by the MacLeod family, including Attorney MacLeod, to pursue aggressively the criminal investigation of Gillyard.
 
 
 12
 On May 11, 1994, after he had been designated as an expert by MacLeod, Smillie interviewed Gillyard again at Gillyard's place of business, allegedly as part of his investigation of the crime. Gillyard's counsel had no notice of this interview, which lasted several hours. One week after his interview of MacLeod, Smillie traveled to Sacramento, where he met with Attorney MacLeod and participated in a conference call with another of the plaintiffs' experts. The next day, pursuant to a subpoena, Smillie gave MacLeod a number of documents that he had obtained from Gillyard, including handwriting samples.
 
 
 13
 In response to this interview, counsel for Gillyard brought a motion to dismiss, or in the alternative, a motion to disqualify MacLeod as counsel or to exclude Smillie as a witness in Lewis's case, on the ground that the interview constituted an impermissible ex parte contact between Lewis's expert and defendant. The district court granted the motion to exclude Smillie on June 6, 1994. On June 20, 1994, identical motions to dismiss were granted by stipulation in the Estate's cases against Gillyard and the other fraud defendants.[2] Also on June 20, at the request of plaintiffs, the district court dismissed the remaining claims against Gillyard, Kodama-Schulman, Inc. and its principals, and the Doe defendants with prejudice, stating in the order that "Plaintiff's counsel has stated on the record his reservation of the right to appeal the order of the Court relating to the testimony of Mr. Smillie."
 
 DISCUSSION
 
 14
 On appeal, Lewis and MacLeod challenge the district court's grant of the 12(b)(6) motions in favor of all the bank defendants and the exclusion of Officer Smillie as a witness.
 
 I. THE BANK DEFENDANTS
 
 15
 The Estate's and Lewis's claims against the bank defendants can be divided into three main categories. The first category consists of claims against banks who sold the teller's or cashier's checks to the plaintiffs. The Estate claims that Glendale, which sold MacLeod teller's checks drawn on Glendale's account at FHLB, breached its contract with MacLeod to pay the teller's checks only upon genuine indorsement of the payee. Lewis likewise claims that TECU, Universal, BofA, and Bay View, as sellers of cashier's and teller's checks, breached their contracts with her.
 
 
 16
 The second category consists of claims against the banks that indorsed and collected the cashier's checks and the payor banks that ultimately paid the checks. The Estate claims that AIB, the bank in which Gillyard deposited the cashier's checks written to miscellaneous payees, and Sumitomo, the bank which accepted the deposit of two unindorsed teller's checks in the account of Kodama-Schulman, Inc., are liable for breach of warranty and conversion. Lewis alleges the same with respect to AIB and CNB, an interim collecting bank for six of the cashier's and teller's checks purchased by Lewis. The Estate further alleges that the payor of MacLeod's teller's checks, FHLB, is liable for conversion, and Lewis alleges the same with respect to BofA and TECU.
 
 
 17
 The final category of claims against the banks consists exclusively of claims against Sumitomo relating to the personal checks written by MacLeod to "Kodama-Schulman." The Estate's complaint can be construed to assert claims for conversion and breach of contract against Sumitomo arising out of its payments of the unindorsed personal checks and Sumitomo's alleged failure to supply an effective indorsement.
 
 A. Standard of Review
 
 18
 We review de novo a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Stone v. Travelers Corp., 58 F.3d 434, 436-37 (9th Cir.1995). A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief. Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir.1995).
 
 
 19
 "When interpreting state law, federal courts are bound by decisions of the state's highest court. 'In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.' " Arizona Elec. Power Coop., Inc. v. Berkeley, 59 F.3d 988, 991 (9th Cir.1995) (quoting In re Kirkland, 915 F.2d 1236, 1239 (9th Cir.1990)). However, where there is no convincing evidence that the state supreme court would decide differently, "a federal court is obligated to follow the decisions of the state's intermediate appellate courts." Kirkland, 915 F.2d at 1239.
 
 B. The Cashier's and Teller's Check Sellers
 
 20
 MacLeod claims that Glendale breached its contract with her to pay her teller's check only upon valid indorsement. Lewis likewise claims that TECU, Universal, BofA, and Bay View breached their implied contracts with her to pay her teller's and cashier's checks only upon valid indorsement. We hold that under California law, such a cause of action exists for the purchasers of cashier's and teller's checks. Nonetheless, because Lewis's complaint alleges that her checks were made payable to "non-existent individuals," her complaint fails to state a claim upon which relief can be granted. Because the Estate's complaint reveals only that MacLeod believed that the payees of her checks "were principals from whom coins were being purchased for Ms. MacLeod," we remand to the district court for a determination of whether the payees of her teller's checks were "non-existent individuals."
 
 
 21
 1. The Cashier's Check and Teller's Check Sellers' Implied
 
 Contracts With Remitters
 
 22
 Under Jerman v. Bank of America National Trust and Saving Ass'n, 7 Cal.App.3d 882, 87 Cal.Rptr. 88 (1970), a remitter of a cashier's check in California can recover for breach of contract from the bank that sold her the cashier's check if the check is not paid to the named payee. Id. at 887, 87 Cal.Rptr. at 92.[3] At least one authority argues that courts should not recognize such an implied contract between a remitter of a cashier's check and the selling bank. See Gregory E. Maggs, Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions, 36 B.C. L.Rev. 619, 654 (1995) (hereinafter "Maggs"). Nonetheless, there is no convincing evidence that the California Supreme Court would depart from the Jerman rule, given that a number of other jurisdictions have likewise concluded that a remitter of a cashier's check can recover for breach of contract if the check is not paid to the named payee. See Lassen v. First Bank Eden Prairie, 514 N.W.2d 831, 836 (Minn.Ct.App.1994) (following Jerman ); Maddox v. First Westroads Bank, 199 Neb. 81, 256 N.W.2d 647, 652 (1977); Twellman v. Lindell Trust Co., 534 S.W.2d 83, 97-98 (Mo.Ct.App.1976) (following Jerman ).
 
 
 23
 We also believe that the California Supreme Court would find a similar implied contract between the remitter of a teller's check and the selling bank. Like the implied contract between a cashier's check remitter and seller, the U.C.C. does not directly provide for an implied contract between teller's check remitters and sellers. We have found no cases discussing a possible implied contract between the purchaser of a teller's check and the selling bank regarding payment to the proper payee. We look, instead, to cases involving implied contracts between sellers and remitters of cashier's checks for an elaboration on the nature of the contract between the seller and remitter.
 
 
 24
 The implied contract between the remitter and the bank as described in Jerman constitutes a promise "that the checks would be paid to the named payee." 7 Cal.App.3d at 887, 87 Cal.Rptr. at 92.[4] Courts in other jurisdictions that have followed Jerman have described the implied contract between the cashier's check purchaser and the selling bank as the bank's "promise to the purchaser (plaintiff) that it would pay the $50,000 to the named payee on presentation of the check," Twellman, 534 S.W.2d at 97, and "calling for the issuing bank to pay the instrument according to its terms." Lassen, 514 N.W.2d at 836. Thus the implied contractual promise described in those cases is the bank's promise that the bank will only pay the cashier's check to the named payee.
 
 
 25
 The teller's checks purchased by MacLeod from Glendale, and by Lewis from Bay View and Universal, like all teller's checks, were drawn on the banks' accounts at other banks.[5] Like any party having an account at a depository bank, Glendale, Bay View, and Universal are treated as customers of their depository banks. See Cal. Com.Code § 4104(1)(e) (West 1964).[6] Unlike banks that sell cashier's checks and are both the drawer and drawees of the checks, Glendale, Bay View, and Universal do not have first-hand control over the payment of their teller's checks. The checks are ultimately paid by FHLB, in the case of Glendale, or by the banks at which Bay View and Universal have accounts from which they draw their teller's check. After issuing the teller's checks, the selling banks do not handle the checks again and are likely not aware that the checks have been paid until they are informed by their depository banks that their accounts have been debited.
 
 
 26
 Under California law, however, a drawer of a check is a "payor" of the check who is entitled to bring a claim for breach of warranty under Cal. Com.Code § 4207(1) (West 1964). Sun 'n Sand, Inc. v. United California Bank, 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920, 928 (1978). Thus, Bay View, Universal, and Glendale, as drawers of the teller's checks, are "payors" who themselves can recover from collecting banks if the teller's checks they sell are paid upon improper indorsement.[7] Though sellers of teller's checks cannot prevent the initial wrongful payment of a check, they can ultimately recover the proceeds of the wrongfully paid checks. Given the existence of this power, it seems unlikely to us that the California Supreme Court would find that the seller of a teller's check does not make the same implied promise to a remitter made by the seller of a cashier's check, especially because the typical purchasers of such checks probably do not distinguish between the two types of checks. Because of the broad protections afforded to consumers by California cases such as Jerman and Sun 'n Sand and the fact that a seller of a teller's check can recover from its depository bank or the collecting banks if a check is improperly paid, we believe that the California Supreme Court would hold that the seller of a teller's check impliedly contracts with the remitter that the check will only be paid upon proper indorsement.[8]
 
 2. The Impostor Defense
 
 27
 Though purchasers of teller's checks and cashier's checks can bring claims against the banks that sell the checks for breach of the implied contract to pay only checks that are properly payable, such a cause of action is not available if the indorsement of the checks is made effective by Cal. Com.Code § 3405 (West 1964) (repealed). Because Lewis's complaint reveals that she made her checks payable to "non-existent individuals," Cal. Com.Code § 3405(1)(a) bars her claim against the banks that sold teller's and cashier's checks to her. Because the Estate's complaint reveals only that MacLeod wrote her checks to people she believed were "principals from whom coins were being purchased," its complaint does not reveal a § 3405(1)(a) defense on its face.
 
 
 28
 In Jerman, the court held that a breach of contract claim would not lie if "the checks in question were made to fictitious payees." 7 Cal.App.3d at 887-88, 87 Cal.Rptr. at 92 (citing Cal. Com.Code § 3405). Jerman 's limitation on breach of contract claims was based on Cal. Com.Code § 3405, and what is commonly know as the "impostor" defense. Because the revised U.C.C. did not take effect until January 1, 1993, and does not apply retroactively to events occurring before that date, this case is governed by former section 3405 of the Commercial Code. See Title Insurance Co. of Minnesota v. Comerica Bank, 27 Cal.App.4th 800, 804, 32 Cal.Rptr.2d 735, 738 n. 2 (1994). That section reads in relevant part:
 
 
 29
 (1) An indorsement by any person in the name of a named payee is effective if
 
 
 30
 (a) An impostor by use of the mails or otherwise has induced the maker or drawer to issue the instrument to him or his confederate in the name of the payee; or
 
 
 31
 * * * * * *
 
 
 32
 (c) An agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.
 
 
 33
 Cal. Com.Code § 3405 (West 1964) (repealed). The purchasers of cashier's checks and teller's checks are treated as drawers for the purpose of applying § 3405.[9] If this section functions to make the forged indorsement "effective," "the drawee bank need not recredit the drawer's account after paying on the forged indorsement." Barkley Clark & Barbara Clark, The Law of Bank Deposits, Collections, and Credit Cards p 12.07 (rev. ed.1995) (hereinafter "Clark").
 
 
 34
 We reject TECU's argument that subsection (c) provides a ground for affirming the district court's dismissal of Lewis's claims against it. In support of the application of Subsection (c), TECU argues that "Yeleti" was an agent of Lewis, the maker of the cashier's checks, and that Yeleti "supplied [Lewis] with the name of the payees" without intending "the payees to have an interest in the checks." While it is possible that this defense would be available to TECU upon further factual development, it was not available for the purpose of a 12(b)(6) motion. Because subsection (1)(c) "does not apply if the instrument has not been prepared on the basis of information supplied by an 'agent' or 'employee' of the drawer, it is essential to determine if the person supplying the nominal payee information is in fact an agent or employee." Anderson, supra, § 3-405:54. While in some cases, a complaint would reveal beyond doubt an agency or employee relationship, this is not such a case. Factual inquiries outside the complaint are necessary to determine if Lewis had the requisite control over "Yeleti" to make him her agent. The defense of § 3405(1)(c) was not available to TECU on its motion to dismiss.
 
 
 35
 Subsection (a) is the appropriate subsection to consider in the case at hand. In a typical impostor defense case, an individual, actually named John Doe, represents to the drawer that he is someone named Richard Roe. The drawer is induced by the person he believes is Richard Roe to write a check to Richard Roe as the payee. In such a case, an endorsement by anyone in the name of Richard Roe is effective. Title Ins., 27 Cal.App.4th at 804-05, 32 Cal.Rptr.2d at 738; Clark, supra, p 12.07; Bailey, supra, p 31.2.
 
 
 36
 In contrast, when an individual merely represents to a drawer that he is the agent of a principal, and induces the drawer to issue a check to him with the principal as payee, the impostor defense does not apply. In the typical case, John Doe falsely asserts that he is an agent for a principal that actually exists, such as IBM or Frank Sinatra, and induces the drawer to write a check to IBM or Mr. Sinatra. See, e.g., Title Ins., 27 Cal.App.4th at 805, 32 Cal.Rptr.2d at 738 (bank made check payable to woman whose son falsely claimed to be acting as her agent); Snow v. Byron, 580 So.2d 238, 242 (Fla.1991) (individual correctly identified himself but falsely asserted that he was agent for principal in acquiring check with principal as payee); Clients' Sec. Fund of the Bar of New Jersey v. Allstate Ins. Co., 219 N.J.Super. 325, 530 A.2d 357, 360-61 (1987) (attorney merely falsely represented that he was acting as agent of clients and did not impersonate anyone); Leonard Smith, Inc. v. Merrill Lynch, Pierce, Fenner and Smith, 113 A.D.2d 387, 495 N.Y.S.2d 769 (1985) (individual falsely identified himself as agent of insurance company and induced drawer to deliver check with company as payee to him), appeal denied, 68 N.Y.2d 661, 505 N.Y.S.2d 76, 496 N.E.2d 235 (1986). These cases generally relied on the comments to the former U.C.C. which state: " 'Impostor' refers to impersonation, and does not extend to a false representation that the party is the authorized agent of the payee. The maker or drawer who takes the precaution of making the instrument payable to the principal is entitled to have his indorsement." Uniform Commercial Code § 3-405 cmt. 2 (1962).[10]
 
 
 37
 Lewis's and MacLeod's situations lie somewhere between these two most common scenarios. While it is true that the person or persons falsely calling themselves "Yeleti" and "Singerman" falsely asserted that they were agents of the payees of Lewis's and MacLeod's checks, that was not the extent of their deception. Lewis's complaint indicates that the person who contacted her impersonated someone named "Yeleti" and that that person directed her to purchase checks payable to non-existent payees. The Estate's complaint likewise indicates that the person who contacted MacLeod impersonated someone named "Singerman," but does not indicate that the payees were non-existent.
 
 
 38
 Appellants assert that comment 2 to U.C.C. § 3-405, with its declaration that "impersonation" does not extend to a false representation of agency, and language from comment 1, indicate that because "Yeleti" and "Singemerman" claimed to be agents of the payees of the checks, subsection (a) does not apply, regardless of whether the payees actually existed. The language cited by Appellants indicates that "[t]he words 'fictitious or nonexisting person' have been eliminated as misleading, since the existence or nonexistence of the named payee is not decisive and is important only as it may bear on the intent that he shall have no interest in the instrument." Uniform Commercial Code § 3-405 cmt. 1 (1962).[11] The Appellants' argument is supported somewhat by the comments to new Cal. Com.Code § 3404(a), which defines an impostor as a person "impersonating the payee of the instrument or a person authorized to act for the payee." Cal. Com.Code § 3404(a) (West Supp.1995). Comment 1 indicates that the new impostor section:
 
 
 39
 changes the former law in a case in which the impostor is impersonating an agent. Under former Section 3-405(1)(a), if Impostor impersonated Smith and induced the drawer to draw a check to the order of Smith, Impostor could negotiate the check. If Impostor impersonated Smith, the president of Smith Corporation, and the check was payable to the order of Smith Corporation, the section did not apply.... In revised Article 3, Section 3-404(a) gives Impostor the power to negotiate the check in both cases.
 
 
 40
 Uniform Commercial Code § 3404 cmt. 1 (1992) (emphasis added). Note that the comment does not differentiate between the situation where the Smith Corporation actually exists and where it is merely a fictitious principal.
 
 
 41
 The most recent articulation of the impostor rule by a California court also contains language that lends some support to the Appellants' position. In Title Insurance, Rudy Nastor, using a forged power of attorney, was given a check containing the proceeds of a mortgage on his mother's house for delivery to his mother, Helen. Someone impersonating Helen indorsed the check and received the proceeds of the check from a bank where the mortgage company held an account. The bank was not entitled to rely on the § 3405(a) defense because Rudy merely misrepresented that he was Helen's agent; there was no impersonation of Helen in causing the mortgage company to issue the check. 27 Cal.App.4th at 805, 32 Cal.Rptr.2d at 738-39. In so holding, the court stated that "the impostor rule is applicable only when the issuance of the check has been accomplished through impersonation of the payee." 27 Cal.App.4th at 804, 32 Cal.Rptr.2d at 738 (emphasis in original).
 
 
 42
 A closer examination of the policy behind the impostor rule, however, reveals that Lewis's case should be treated like the situation where the impostor and payee are the same person, rather than like the cases where an individual merely misrepresents that he or she is an agent for a principal. As stated in Title Insurance, § 3405 is designed to shift "the risk of loss ... to the drawer of the instrument ..., who was in a better position to detect the fraud." 27 Cal.App.4th at 805, 32 Cal.Rptr.2d at 738. In other words, the "justification of the impostor rule is keeping the loss with the party that was so embarrassingly duped." Clark, supra, p 12.07.[12] The California Commercial Code is to "be liberally construed and applied to promote its underlying purposes and policies." Cal. Com.Code § 1102 (1964) (repealed). According to the U.C.C. Comment for that section: "It is intended to make it possible for the law embodied in this Act to be developed by the courts in light of unforeseen and new circumstances and practices." Uniform Commercial Code § 1-102 cmt. 1 (1962).[13] It is our opinion that the California Supreme Court would find that Lewis's case presents such an unforeseen circumstance, and that the policy of § 3405 would be undermined if the forged signatures of the payees were not considered effective.
 
 
 43
 The policy underlying § 3405 has been furthered in the courts' treatment of the two most common impersonation situations discussed above. Where an impostor impersonates an individual and convinces the drawer to issue a check to him or her with his or her false name as the payee, the drawer bears the loss from the check because the drawer was the party most directly duped by the impostor and the party in the best position to avoid the loss. Where a person merely represents that he or she is an agent of an actual existing principal and the check is issued in the name of that principal, it is the bank that bears the loss because it was in the better position to detect a fraudulent indorsement-the bank paid to someone other than an existing principal while the drawer was only tricked about the true powers of the agent.
 
 
 44
 Here, Lewis was deceived about "Yeleti's" agency, deceived about "Yeleti's" identity, and induced by "Yeleti" to issue a check in the names of non-existent payees. Lewis, who dealt directly with the impostor and his cohorts, was in a better position to detect the fraud. The banks were no more capable of detecting the fraud than they would have been if "Yeleti" were the impostor and the payee. The fact that "Yeleti" imposed one more level of deception upon Lewis by requesting that different impostors than himself be named the payees does not shift the burden of preventing the loss to the banks. Because the policy underlying Cal. Com.Code § 3405 mandates that the loss from forgery be born by a party, like Lewis, who was the primary victim of a fraud, the indorsements of the TECU and BofA checks are effective. Consequently, the district court properly granted the 12(b)(6) motions of TECU, BofA, Bay Area, and Universal.
 
 
 45
 Basing our decision only on the allegations in the complaint, we cannot conclude that MacLeod was in a better position than Glendale to avoid the loss caused by the indorsement of her teller's checks.[14] If MacLeod made the check payable to an actual existing payee who could sell her valuable coins, the case would be similar to a case where the check had been stolen from MacLeod and the indorsement had been forged-a situation where the bank bears the loss. Although MacLeod would have been somewhat responsible for the forged indorsement because of her being duped by "Singerman" into believing that he was an actual agent for the payee, the bank likewise would have been duped by improperly paying a check payable to an actual payee upon a forged indorsement. Where both parties are duped, there is no clear policy in favor of imposing the loss on the drawer instead of the bank, so the bank bears the loss for paying upon a forged indorsement.
 
 
 46
 If, however, the payee was non-existent, there would be no genuine indorsement to which MacLeod would be entitled, and any indorsement in the name of the payee would be effective. By requiring the district court to determine if MacLeod's payees were "non-existent," we do not mean to require that there be no one at all with the same names of the payees. We mean only that the payees in this case are non-existent if, in fact, there was no one with the name of the named payees from whom MacLeod could have bought valuable coins. MacLeod would be the party most appropriate to bear the loss despite the mere happenstance that someone, somewhere has the same name as one of the named payees, because she would be the party who dealt directly with the impostor "Singerman" and wrote a check to an intended payee who was actually non-existent.[15] We believe that in such a situation, the California Supreme Court would hold that § 3405 applies to supply Glendale with a defense against its alleged improper payment of the teller's checks.
 
 
 47
 For the reasons stated above, the district court properly dismissed Lewis's claims against TECU, BofA, Universal, and Bay Area pursuant to Fed.R.Civ.P. Rule 12(b)(6). We remand to the district court for further proceedings on the Estate's claim against Glendale.
 
 C. The Collecting and Payor Banks
 
 48
 Lewis and the Estate both argue that the banks that collected and paid the teller's and cashier's checks are liable for conversion and breach of warranty. We hold, however, that neither the Estate nor Lewis has standing to bring claims for either breach of warranty or conversion against the collecting or paying banks.
 
 1. Claim for Breach of § 4207 Warranties
 
 49
 Section § 4207 of the California Commercial Code as it existed when the events in question occurred provided that each customer or collecting bank who obtains payment for a check makes several warranties "to the payor bank or other payor who in good faith pays or accepts the item." Cal. Com.Code § 4207 (1964) (repealed). Because neither Lewis nor MacLeod was an "other payor" of the cashier's or teller's checks they purchased, they have no standing to bring a § 4207 claim against the collecting and paying banks.
 
 
 50
 Sehremelis v. Farmers & Merchants Bank, 6 Cal.App.4th 767, 7 Cal.Rptr.2d 903 (1992), relied on by the Estate and Lewis, is inapposite. In Sehremelis, a construction company had obtained millions of dollars in loans from the bank, which were placed in a "loans in progress" account. The construction company was to submit vouchers to the bank when construction expenses arose, and the bank would in turn issue checks to pay those expenses. Two employees of the company misappropriated funds from the account by submitting forged vouchers, causing the bank to issue checks in the name of companies they had created. The construction company was a "payor" who could sue for breach of warranties because the checks were paid from the "loans in progress" account, making the construction company functionally similar to a drawer from a personal checking account. Id. at 774, 7 Cal.Rptr.2d at 906. In Sun 'n Sand, Inc. v. United California Bank, 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (1978), relied on by Sehremelis, the California Supreme Court held that the drawer of a personal check was a payor under § 4207 because its account was debited by the last payor bank after the check had made its way from the cashing party through the banking system. Id. 148 Cal.Rptr. at 337 , 582 P.2d at 928.
 
 
 51
 In the case at hand, MacLeod and Lewis cannot be construed as payors of the cashier's or teller's checks. MacLeod and Lewis paid the banks to issue the checks payable to the payees; the banks were the drawers of the checks in question. Sehremelis, 6 Cal.App.4th at 774, 7 Cal.Rptr.2d.at 906. The construction company in Sehremelis was only a "payor" of the checks because its loan account was debited after the payor bank received the checks for collection; it was similar to the drawer of a personal check. Here, as in all typical cashier's and teller's check transactions, when the final payor bank received the cashier's or teller's checks from the collecting banks, nothing more was paid by MacLeod or Lewis. Thus, none of the warranties under § 4207 was passed along to them, and they have no standing to bring a breach of warranty claim.
 
 2. Conversion Claims
 
 52
 A party with rights to an instrument can bring a claim for conversion if the instrument is paid on a forged indorsement. Cal. Com.Code § 3419(1)(c) (West 1964) (repealed). A remitter of a cashier's check, however, does not have rights in an instrument. "The purchaser of a treasurer's check who remits the check cannot sue a collecting bank for conversion in payment on a forged indorsement because the purchaser does not have any property right in the check...." Anderson, supra, § 3-419:42. "The purchaser is not a party to the cashier's check itself unless named as payee or unless the purchaser adds his own signature or indorsement to the instrument." Bailey, supra, p 1.17.[16]
 
 
 53
 No California case has dealt with the question of whether a remitter of a cashier's check has standing to bring a conversion claim. The majority of courts in other jurisdictions, however, have explicitly determined that remitters of cashier's checks do not have standing to bring a conversion claim. See, e.g., Lassen, 514 N.W.2d at 838 (remitter of cashier's check had no property right in checks and no conversion claim, but did have breach of contract claim); C.A.L., Inc. v. Worth, 813 S.W.2d 12, 16 (Mo.Ct.App.1991) ("[T]he remitter, who has purchased a cashier's check, is not the owner of the check and is not the proper party to sue for conversion."); Twellman, 534 S.W.2d at 96-97 (remitter not a proper party for conversion suit; holder or payee would be proper); DiMonda v. Freedom Fed. Sav. & Loan Ass'n, 385 Mass. 1012, 434 N.E.2d 210, 211 (1982) (remitter was not a party to cashier's check and could not recover from drawee or drawer bank). But see Lawrence v. Central Plaza Bank and Trust Co., 469 So.2d 201, 204 (Fla.Ct.App.1985) (holding that remitter of cashier's check has ownership interest in funds represented by check until delivery of check to payee). We follow the majority of courts and authorities and believe that the California Supreme Court would hold that MacLeod and Lewis have no standing for a conversion claim against the collecting or paying banks.
 
 
 54
 Because neither Lewis nor the estate have standing to bring a conversion or breach of warranty claim, the district court properly dismissed the Estate's and Lewis's claims against AIB, CNB, BofA, FHLB, TECU, and Sumitomo arising out of their collecting and paying of MacLeod's and Lewis's cashier's and teller's checks.
 
 
 55
 D. Personal Checks Written to Kodama-Schulman
 
 
 56
 In addition to the numerous teller's checks written to various payees, MacLeod wrote seven personal checks, totalling $101,066 to "Kodama-Schulman." According to the Estate's complaint, "Singerman" told MacLeod that "Kodama-Schulman" "was his accountant and that the proceeds would be transferred by the payee to make investments in gold and silver coins on behalf of Ms. MacLeod." Each of the seven checks was deposited in an account at Sumitomo bank controlled by Kodama-Schulman, Inc., a suspended California corporation, and several other individuals. None of the checks was indorsed by the payee, but six of the seven checks bear a Sumitomo supplied stamp, stating in five cases that the checks were deposited to the account of the "within named payee," and stating in the other instance that the check was credited to "Kodama/Oswalt/Schulman Inc." According to the complaint, the Estate "is informed and believes that the account to which they were deposited was not a customer of the bank, and that the account holder is actually that of a similarly named but different account holder." The seventh check written to "Kodama-Schulman" bears neither an indorsement by the payee nor a bank supplied stamp.
 
 
 57
 The Estate alleges that the indorsements supplied by Sumitomo were not effective because Kodama-Schulman, Inc., as a suspended corporation, was not entitled to indorse checks, and because the payee of the checks, "Kodama-Schulman," was not a customer of the bank. While the Estate does not have standing to bring a claim against Sumitomo for conversion of MacLeod's personal checks, the complaint does reveal facts sufficient to state a claim against Sumitomo for breach of the warranty of good title under Cal. Com.Code § 4207(1)(a).[17]
 
 1. Conversion
 
 58
 California courts are divided on the issue of whether the drawer of a personal check has a claim for conversion against a depository bank. We conclude that the cases finding no such claim have the better of the argument and that the California Supreme Court would so hold. As explained in Sehremelis,
 
 
 59
 although a collecting bank's payment on a forged indorsement directly injures the payee of the check, injury to the drawer, and collecting bank liability for it, are contingent at best. They do not ripen unless and until the drawee-payor bank charges the drawer for the check and the time to reverse the charge expires. But at that point, "the drawer's cause of action for such conversion only runs against the drawee bank. Thus while a payee is entitled to sue a depository bank in conversion for money paid to a third person on a forged endorsement which should have been paid to him, a drawer has no such right to sue a depositary or collecting bank for conversion.... [H]is cause of action against them is restricted to his contract claim based on the warranties impliedly extended to him by the negotiation of the check...."
 
 
 60
 Sehremelis, 6 Cal.App.4th at 776, 7 Cal.Rptr.2d at 907-08 (quoting Allied Concord Fin. Corp. v. Bank of America Nat'l Trust and Sav. Assoc., 275 Cal.App.2d 1, 8, 80 Cal.Rptr. 622, 627 (1969)) (alterations in original). See also Brady, supra, p 29.26 n. 237 ("A right of action against one taking under a forged indorsement for conversion is permitted under U.C.C. § 3-419(1)(c) (1962), but this right should be limited to favor only the owner of the check, who would ordinarily be the person whose indorsement is forged."); Clark, supra, p 12.05[a] ("The better rule is that the drawer should not be given a cause of action in conversion; he already has an adequate remedy [against the drawee] in the form of recrediting his account" for improper payment under California Commercial Code § 4401.).
 
 
 61
 Tedesco v. Crocker Nat'l Bank, 148 Cal.App.3d 1211, 1216, 196 Cal.Rptr. 534, 537 (1983), relied on by the Estate, is unpersuasive. Tedesco followed Cooper v. Union Bank, 9 Cal.3d 371, 107 Cal.Rptr. 1, 507 P.2d 609 (1973), in finding that a drawer had a cause of action for conversion against a collecting bank that wrongly paid a check. Cooper, however, only held that a payee has a cause of action for conversion against a collecting bank that wrongly pays a check. Id. 107 Cal.Rptr. at 10 , 507 P.2d at 618. The Tedesco court completely failed to distinguish between a payee and drawer in holding that Cooper granted a conversion cause of action for drawers. See Sehremelis, 6 Cal.App.4th at 777, 7 Cal.Rptr.2d at 908 ("[T]he [Tedesco ] opinion simply fails to distinguish the rules and relationships respectively applicable to payees and drawees"). We find that the California Supreme Court would follow Sehremelis and Allied and hold that a drawer does not have a cause of action for conversion against a collecting bank.
 
 2. Breach of the Warranty of Good Title
 
 62
 Former Cal. Com.Code § 4207(1) provides that "[e]ach customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank" makes certain warranties "to the payor bank or other payor who in good faith pays or accepts the item." Cal. Com.Code § 4207(1) (West 1964) (repealed). Under California law, the Estate has standing to bring a claim for breach of warranty because MacLeod was an "other payor" of her personal checks to whom warranties run. Sun 'n Sand, 148 Cal.Rptr. 329, 582 P.2d at 928; Sehremelis, 6 Cal.App.4th at 773-774, 7 Cal.Rptr.2d at 906.
 
 
 63
 The complaint adequately alleges that Sumitomo may have breached the warranty of good title, by which a party warrants that it has "a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title." Cal. Com.Code § 4207(1)(a) (West 1964) (repealed). "This warranty of 'good title' refers to 'the validity of the chain of necessary indorsements.' " Sehremelis, 6 Cal.App.4th at 773, 7 Cal.Rptr.2d at 905. In Sehremelis, the court held that the plaintiff had stated a cause of action for breach of § 4207 against the bank that had paid several checks issued from its account pursuant to indorsements that were "forged, missing or otherwise unauthorized." Id., 7 Cal.Rptr.2d at 906. Here, MacLeod alleges that the indorsements of her personal checks written to Kodama-Schulman were not properly indorsed, or in one case, not indorsed at all.
 
 
 64
 The complaint reveals, and Sumitomo does not dispute, that none of the personal checks was indorsed by any customer; instead, an indorsement was "supplied" by Sumitomo pursuant to former California Commercial Code § 4205(1). That section provides, in relevant part, that "[a] depository bank which has taken an item for collection may supply any indorsement of the customer which is necessary to title.... [A] statement placed on the item by the depository bank to the effect that the item was deposited by a customer or credited to his account is effective as the customer's indorsement." Cal. Com.Code § 4205(1) (West 1964) (repealed).
 
 
 65
 We decline the Estate's invitation to find that Sumitomo's supplied indorsement was ineffective merely because Kodama-Schulman, Inc. was a suspended corporation. We recognize that the California Revenue and Taxation Code made it a crime for someone to exercise "the powers, rights and privileges" of a suspended corporation at the time of Sumitomo's indorsement. Cal. Rev. & Tax Code § 25962.1 (West 1992) (repealed). The purpose of Cal. Rev. & Tax Code § 23301, which provides for the suspension of California corporations, is to "put pressure on the delinquent corporation to pay its taxes." Peacock Hill Ass'n v. Peacock Lagoon Constr. Co., 8 Cal.3d 369, 105 Cal.Rptr. 29, 30, 503 P.2d 285, 286 (1972). Such a purpose necessarily contemplates that the corporation will be able to draw checks to pay its taxes, and probably to indorse checks where funds from such checks are necessary for the suspended corporation to pay its taxes. Moreover, even if we were to find that § 25962.1 does eliminate a suspended corporation's power to indorse checks, it does not follow that a bank could not supply an indorsement pursuant to Cal. Com.Code § 4205(1). Declaring that a bank supplied indorsement is ineffective where the customer is a suspended corporation would be tantamount to requiring banks to confirm the corporate status of all corporate customers before providing an indorsement. This requirement would be unduly burdensome, and would undercut the efficiency creating goal of § 4205. See Uniform Commercial Code § 4205 cmt. 1 (1962) ("Subsection (1) is designed to speed up collections by eliminating any necessity to return to a non-bank depositor any items he may have failed to indorse.").
 
 
 66
 The depository bank, however, may not supply the indorsement of just any customer. For a supplied indorsement to be effective under § 4205(1), the payee of the check and the customer in whose account the check is deposited must be one and the same. See, e.g., Mid-Atlantic Tennis Courts, Inc. v. Citizens Bank and Trust Co. of Maryland, 658 F.Supp. 140, 143 (D.Md.1987) (indorsement not effective where check was deposited in bank customer's account without indorsement of different payee); Kelly v. Central Bank and Trust Co. of Denver, 794 P.2d 1037, 1041-42 (Colo.Ct.App.1989) (bank could not effectively provide indorsement of payee who was not bank's customer); Krump Const. Co. v. First Nat'l Bank of Nevada, 98 Nev. 570, 655 P.2d 524, 525 (1982) ("Agency authority to supply missing endorsements [under § 4205] accrues only when a party becomes a customer of the bank."). Because MacLeod's checks were written to "Kodama-Schulman," and were indorsed with the account number and deposited in the account of "Kodama-Schulman, Inc.," or "Kodama/Oswalt/Schulman," the Estate claims that the bank improperly supplied the indorsement of a customer who was not the payee of the check, and thus the indorsement is ineffective.
 
 
 67
 An indorsement is not ineffective merely because it differs somewhat from the exact words used for the named payee. A difference between the name of the payee and the indorsement is irrelevant if the intended payee actually receives the proceeds of the check. In Blackmon v. Hale, 1 Cal.3d 548, 83 Cal.Rptr. 194, 463 P.2d 418 (1970), Blackmon had written a check to the trust account of his attorneys, the "Adams and Hale Trust Account," so that he could make an offer on a note and mortgage. The attorneys indorsed the check, "Pay to the order of California Bank; Adams, Hale and Lee Trust Account," with a rubber stamp and the check was deposited in the Adams, Hale, and Lee Trust Account at California Bank. When one of the partners absconded with the money and the partnership dissolved, Blackmon sued the bank for recovery of his money, contending that the bank was liable to him for wrongly depositing the check in the Adams, Hale, and Lee account. Because Blackmon testified that he wanted the money deposited in the law firm's trust account, "[t]he incompleteness and irregularity of the name of the payee was inconsequential, for the check reached its intended destination. [Blackmon] was not injured by the deposit of the funds in the Adams, Hale, and Lee Trust Account instead of the Adams and Hale Trust Account." Id. 83 Cal.Rptr. at 197-98 , 463 P.2d at 421-22.[18] This rule is reflected in the revised version of the Commercial Code: "The person to whom an instrument is initially payable is determined by the intent of the person ... signing as ... the issuer of the instrument." Cal. Com.Code § 3110(a) (West Supp.1995).[19]
 
 
 68
 In the case at hand, MacLeod's complaint alleges that "Singerman" instructed her that the payee of the checks, "Kodama-Schulman," was his accountant. Each check was deposited in the account of a "Kodama-Schulman, Inc.," a suspended California corporation, and the Estate stated in its complaint its belief "that the payee is not a customer of the bank, and that the account is actually that of a similarly named but different account holder." (emphasis in original). Thus, the complaint reveals that the intended payee and the entity that received the funds are different. The Estate has sufficiently pleaded that the bank's supplied indorsement is ineffective and that the bank breached its warranty of good title as to the checks for which Sumitomo purportedly supplied an indorsement.
 
 
 69
 To recover for breach of warranty on the check that bears neither payee's indorsement nor Sumitomo's supplied indorsement, MacLeod must also show that the intended payee did not receive the funds of the check. If an intended payee actually receives the funds from a check, the absence of any indorsement does not give rise to a breach of warranty claim by a drawer. Campbell v. Bank of America Nat'l Trust & Sav. Assoc., 190 Cal.App.3d 1420, 1426, 235 Cal.Rptr. 906, 910 (1987) (Regardless of indorsement, "the ultimate question under section 4207, subdivision (1)(a), is whether good title to the checks was transmitted to the Bank or whether the Bank was authorized to obtain payment on the checks by one who had good title."); see also Perini Corp. v. First Nat'l Bank of Habersham County, Georgia, 553 F.2d 398, 412 (5th Cir.1977) ("[H]andling a check bearing an incomplete indorsement creates no liability so long as the proceeds reach the payee designated by the instrument."). The Estate's complaint sufficiently alleges that MacLeod's unindorsed personal check was not paid to the intended payee.
 
 
 70
 In conclusion, MacLeod has stated a claim against Sumitomo's for breach of the warranty of good title for the personal checks written to "Kodama-Schulman" as payee. The district court improperly granted Sumitomo's 12(b)(6) motion with regard to the personal checks.
 
 II. THE EXCLUSION OF OFFICER SMILLIE
 
 71
 The Estate and Lewis appeal the district court's exclusion of Officer Smillie as a witness. The appellants voluntarily dismissed their claims against the fraud defendants with prejudice so that they could receive immediate review of the district court's decision. We reverse the district court's exclusion of Smillie as a witness.
 
 A. Jurisdiction
 
 72
 Despite the Estate's and Lewis's voluntary dismissals of their cases against Gillyard and the other fraud defendants pursuant to Fed.R.Civ.P. 41(a)(2), we have jurisdiction to consider the propriety of the district court's exclusion of Officer Smillie as a witness. While this conclusion may have been in doubt for some time, we recently held that it is "clear that plaintiffs may appeal from a voluntary dismissal with prejudice, at least where the plaintiff is not acting pursuant to a settlement agreement intended to terminate the litigation." Concha v. London, 62 F.3d 1493, 1507 (9th Cir.1995) (emphasis in original), cert. dismissed, --- U.S. ----, 116 S.Ct. 1710, 134 L.Ed.2d 772 (1996) ; see also Unioil, Inc. v. E.F. Hutton & Co., Inc., 809 F.2d 548, 556 (9th Cir.1986) ("a dismissal with prejudice [is] appealable, whether voluntary or involuntary"), cert. denied, 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987); Coursen v. A.H. Robins Co., Inc., 764 F.2d 1329, 1342, corrected, 773 F.2d 1049 (9th Cir.1985) ("While a plaintiff cannot appeal a voluntary dismissal without prejudice, he or she may appeal a dismissal with prejudice.").
 
 
 73
 A voluntary dismissal with prejudice is sufficiently adverse to the plaintiff's interests because "if the plaintiff is unsuccessful in challenging the district court's action, then the dismissal operates as an adjudication on the merits and the litigation is terminated." Concha, 62 F.3d at 1507. Rather than undermining "our normal appellate practice by encouraging a flow of appeals that are quasi-interlocutory in nature," this rule "promotes judicial economy" by eliminating the necessity for the district court to conduct extensive trial proceedings despite the plaintiff's belief that an adverse ruling on a preliminary matter is conclusive as to the entire case. Id. at 1508. Thus, we have jurisdiction to hear the Estate's and Lewis's challenges to the district court's exclusion of Officer Smillie as a witness.
 
 B. Standard of Review
 
 74
 In reviewing the district court's exclusion of evidence, we first engage in de novo review of whether the district court had the power to exclude the evidence. Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp., 982 F.2d 363, 367 (9th Cir.1992). If such a power exists, we review the district court's imposition of sanctions for abuse of discretion. Id.
 
 
 75
 Had the district court made factual findings, we would review those findings for clear error. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1408 (9th Cir.1990), cert. denied, 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991). Where, as in this case, the district court has failed to make factual findings, we review the record de novo to determine if the district court abused its discretion. Id. "[A] district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous view of the facts." Beech Aircraft Corp. v. United States, 51 F.3d 834, 841 (9th Cir.1995) (internal citations omitted). We "will not reverse unless we have the 'definite and firm conviction that the district court committed a clear error of judgment.' " Washington State Dept. of Transp. v. Washington Natural Gas Co., Pacificorp, 59 F.3d 793, 805 (9th Cir.1995) (quoting Marchand v. Mercy Medical Center, 22 F.3d 933, 936 (9th Cir.1994)).
 
 C. Merits
 
 76
 While neither the district court's order nor oral argument on the motion revealed the legal basis for the district court's exclusion of Officer Smillie, Gillyard's moving papers relied on the district court's inherent powers to justify the exclusion of Smillie. "Courts are invested with inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " Unigard, 982 F.2d at 368 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991)).
 
 
 77
 This circuit has recognized as part of a district court's inherent powers the "broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial. Within this discretion lies the power to exclude testimony of witnesses whose use at trial ... would unfairly prejudice an opposing party."
 
 
 78
 Id. (quoting Campbell Indus. v. M/V Gemini, 619 F.2d 24, 27 (9th Cir.1980)). The district court clearly had the power to impose a sanction upon Lewis and the Estate if it determined that Smillie had made an impermissible ex parte contact with Gillyard which would unfairly prejudice Gillyard. We conclude, however, that the district court abused its discretion in exercising its inherent power to completely exclude Smillie from testifying.
 
 
 79
 This court has upheld the exclusion of expert testimony under a district court's inherent powers in several different contexts. In Campbell, counsel for Gemini contacted an expert for Campbell ex parte on several occasions. As a result of this contact the expert agreed to testify on behalf of Gemini. The district court viewed this as a blatant violation of Fed.R.Civ.P. 26, and precluded the expert's testimony. We held that the preclusion, "which was carefully fashioned to deny Gemini the fruits of its misconduct yet not to interfere with Gemini's right to produce other relevant expert testimony," did not constitute an abuse of discretion in the exercise of the court's inherent powers. 619 F.2d at 27. One of three experts that Gemini had retained on its own was able to testify at trial "on precisely the issues that [the excluded expert] would have covered." Id.
 
 
 80
 In Unigard, the district court prevented plaintiff's experts from testifying that a portable electric heater had caused a yacht fire. The court imposed this sanction because the plaintiff was responsible for the inadvertent destruction of the heater before trial. Though we concluded that the district court erred in relying on Fed.R.Civ.P. 37 as a basis for the exclusion of the evidence, we held that the "evidence was properly excluded as an exercise of the district court's inherent powers." 982 F.2d at 368. We found that it "was within the district court's discretion to determine that a rebuttable presumption against [plaintiff] would have been insufficient to cure the prejudice arising in the context of this case." Id. at 369.
 
 
 81
 We have recognized that district courts may under its inherent power "impose sanctions for discovery abuses that may not be a technical violation of the discovery rules." Halaco Eng'g Co. v. Costle, 843 F.2d 376, 380 (9th Cir.1988). While the Federal Rules of Civil Procedure do not directly address ex parte contacts, the California Rules of Professional Conduct prohibit attorneys from communicating "directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer." Rules of Professional Conduct of the State Bar of California Rule 2-100 (West 1995). Violators of the rule are subject to sanctions by courts, such as disqualification as counsel. See, e.g., Mills Land and Water Co. v. Golden West Refining Co., 186 Cal.App.3d 116, 230 Cal.Rptr. 461 (1986) (disqualifying counsel for directly contacting corporate officer of opposing party without opposing attorney's permission). Thus, an improper ex parte conduct with Gillyard would merit a sanction under the district court's inherent powers.
 
 
 82
 Officer Smillie's May 1994 interview of Gillyard was, at the very least, suspicious. Smillie, who had been identified by the Estate and Lewis as an expert, had not interviewed Gillyard as a part of his investigation in over a year. In fact, Smillie had been reassigned to the narcotics division of the Long Beach Police. Smillie knew that Attorney MacLeod had planned to send a letter to Smillie's superior complaining that he was not pursuing the investigation adequately, and Attorney MacLeod admits that he and his family encouraged Smillie to pursue the investigation as a whole. Prior to his interview of Gillyard, Smillie told Attorney MacLeod that he was considering interviewing Gillyard again and obtaining a handwriting sample, and counsel encouraged him to go through with the interview. According to Gillyard, during his three hour interview, Smillie asked him how he could afford Gibson, Dunn & Crutcher as his attorneys, and how he could afford to go to Sacramento for his deposition in the civil case. Smillie met with MacLeod in Sacramento one week later to discuss the interview, and participated in a conference call with another of the plaintiffs' experts. The next day, pursuant to a subpoena, Smillie turned over to MacLeod all the documents he had collected from Gillyard. While Smillie's contact with Gillyard may not have been initiated by Attorney MacLeod, MacLeod certainly should have recognized the improper appearance of Smillie's interview of Gillyard and MacLeod's subsequent meeting with Smillie, and taken steps, such as contacting Gillyard's attorney to warn him of the impending interview, that would have avoided prejudice to Gillyard.
 
 
 83
 While a sanction was appropriate in this case, the scope of the sanction imposed by the district court was an abuse of its discretion. In Campbell, we upheld the exclusion of evidence under the district court's inherent powers because the preclusion "was carefully fashioned to deny Gemini the fruits of its misconduct yet not to interfere with Gemini's right to produce other relevant expert testimony." 619 F.2d at 27 (emphasis added). The district court's sanction in this case was not "carefully fashioned;" it denied Lewis and the Estate the opportunity to call Officer Smillie as either an expert or percipient witness, rather than tailoring its sanction to deprive the plaintiffs of information or exhibits wrongly acquired during the second interview of Gillyard.
 
 
 84
 Because the district court's sanction was not "carefully fashioned," it unduly interfered with the plaintiffs' ability to produce relevant evidence. In Campbell, Gemini had available three additional experts of its own who could testify regarding the precise issues about which the excluded expert would have testified. Id. Lewis and the Estate did not have such an option in this case. The three other hired experts of the plaintiffs-a handwriting expert, a financial analysis expert, and a check cashing company manager-could not have provided the testimony that Smillie would supply as an expert witness. While the plaintiffs could have offered the testimony of Officer Leonard Gaeta about the original interview with Gillyard in April 1993, there is no guarantee that Gaeta's recollection of the facts would be an adequate substitute for Smillie's testimony. Moreover, even if the substance of Gaeta's testimony would be substantially identical to Smillie's, the factual issue would likely turn on the relative credibility of Gaeta and Smillie on the one hand, and Gillyard on the other. Thus, the exclusion of Smillie's percipient testimony as to his recollection of what Gillyard said would likely have seriously weakened the plaintiffs' case, even if Gaeta could testify about his recollection of the interview.
 
 
 85
 Our decision in Unigard is consistent with the "carefully fashioned" requirement set forth in Campbell. Though we excluded all expert testimony regarding the portable heater's connection to the fire, effectively dismissing the entire case, such a sanction was necessary because plaintiff was responsible for the destruction of the heater, and defendant would have had no opportunity to conduct its own inspection of the evidence and to rebut the plaintiff's expert testimony. 982 F.2d at 368. In this case, Gillyard will have every opportunity to rebut the testimony of Smillie.
 
 
 86
 While we have concluded that a sanction was appropriate in this case, the district court abused its discretion by completely excluding Officer Smillie from testifying. Should the district court choose to impose a modified sanction, it may prohibit Officer Smillie from testifying regarding his May 1994 interview of Gillyard, and prohibit the plaintiffs from introducing any documents or handwriting samples acquired by Officer Smillie from Gillyard at that interview or testimony regarding that evidence.
 
 CONCLUSION
 
 87
 For the foregoing reasons, we REVERSE the district court's grant of Glendale's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), and remand for a determination of whether the payees of MacLeod's teller's checks were non-existent. We REVERSE the district court's grant of Sumitomo's 12(b)(6) motion insofar as it relates to MacLeod's personal checks that were collected by Sumitomo. We AFFIRM the 12(b)(6) motions on all other claims against all other bank defendants. Finally, we REVERSE the district court's dismissal with prejudice of the Estate's and Lewis's claims against the fraud defendants.
 
 
 
 *
 Hon. Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 For convenience, Gillyard, Kodama-Schulman, Inc. and its principals, and the Doe defendants will often be referred to collectively as the "fraud defendants." The banks will be referred to collectively as the "bank defendants."
 
 
 [2]
 In July 1993, as a courtesy to Gillyard, the Estate, acknowledging the damage that the lawsuit could do to Gillyard's business, had voluntarily dismissed Gillyard without prejudice from his original lawsuit. At that time, Gillyard waived any objection that he might have to the Estate's amending its complaint and returning Gillyard to the case. When the Estate later sought to amend its complaint to return Gillyard to the case, Gillyard apparently objected, causing the Estate to file another action against him in April 1994, including the same claims against Gillyard that were in the original Estate complaint
 
 
 [3]
 The precedential support for the California Court of Appeals' decision in Jerman is questionable, at best. In concluding the bank had an implied contract with the cashier's check purchaser that the checks would only be paid to the named payees, the court relied on Cal. Com.Code § 3419(1)(c), creating a cause of action for conversion when an instrument is paid upon a forged indorsement, and Harry H. White Lumber Co. v. Crocker-Citizens Nat'l Bank, 253 Cal.App.2d 368, 376, 61 Cal.Rptr. 381 (1967), which held that a joint payee of a check could recover from a collecting bank when that bank paid the check to a joint payee who forged the other joint payee's signature. These authorities do not directly support the Jerman court's holding
 
 
 [4]
 See also id. at 888, 87 Cal.Rptr. at 93 ("If Jerman had lost the checks before delivery to the named payees, Bank of America, if it thereafter paid the same on forged endorsements, would undoubtedly have been liable to Jerman or the named payees.")
 
 
 [5]
 "Teller's check" was not defined in the U.C.C. that governs this case. The new U.C.C. states: " 'Teller's check' means a draft drawn by a bank (1) on another bank, or (2) payable at or through a bank." Cal. Com.Code § 3104(h) (West Supp.1995)
 
 
 [6]
 The new version of § 4104 states, " 'Customer' means a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank." Cal. Com.Code § 4104(a)(5) (West Supp.1995)
 
 
 [7]
 In addition, under Cal. Com.Code § 4401, Glendale, Universal, and Bay Area could recover from their depository banks if the banks paid a check drawn on their account that was not "properly payable." Cal. Com.Code § 4401(a) (West Supp.1964)
 
 
 [8]
 We emphasize that we so hold only because under California law there is such a contract between a cashier's check seller and remitter. In addition, we believe that under revised Cal. Com.Code § 4207 (West Supp.1995) the California Supreme Court could hold that there would be no such contractual protection for teller's check remitters because under revised § 4207, warranties run only to "subsequent collecting bank[s]" and not to drawers of checks. Id. Thus, our holding is limited to cases governed by the former Cal. Com.Code, in effect prior to 1993
 
 
 [9]
 "The purchaser of a treasurer's check will be treated as a 'drawer' thereof for the purpose of applying U.C.C. § 3-405." Ronald A. Anderson, Anderson on the Uniform Commercial Code § 3-405:6 (3d ed.1993) (citing Twellman ). "Treasurer's check" is another name for "cashier's check." Henry J. Bailey and Richard B Hagedorn, Brady on Bank Checks p 1.17 (7th ed.1992) (hereinafter "Bailey")
 
 
 [10]
 At least one authority suggests that comment 2 conflicts with the literal language of § 3405, and that an individual's misrepresentation that he is the agent of a principal should be covered by former § 3405. Clark, supra, § 12.07[a] (1995). However, as the cases cited indicate, comment 2 has been widely followed
 
 
 [11]
 Comment 1 to the former U.C.C. § 3-405 reveals that § 3405, while eliminating the importance of any determination that a payee is "fictitious or nonexistent," actually "enlarges the original subsection to include additional situations which it has not been held to cover." Id. Thus, comment 1, read as a whole, indicates that if a drawer is induced to issue a check to a payee in a manner covered by § 3405, any person, whether it be the impostor himself or someone else, can effectively indorse the check. Id
 
 
 [12]
 See also Intelogic, 626 N.E.2d at 842 ("A general principle under Article 3 of the U.C.C. is that the loss resulting from a forged indorsement should fall upon the party best able to prevent it."); Underpinning & Foundation Constructors, Inc. v. Chase Manhattan Bank, N.A., 46 N.Y.2d 459, 414 N.Y.S.2d 298, 386 N.E.2d 1319, 1323 (1979) ("In certain instances in which it is clear that the loss could have been most readily prevented by the drawer, the code may place the loss upon the drawer as a matter of law (Uniform Commercial Code, § 3-405)."); Covington v. Penn Square Nat'l Bank, 545 P.2d 824, 826 (Okla.Ct.App.1975) ("The policy underlying [§ 3-405(1)(a) ] is that the person who is taken in by an imposter or a dishonest employee should bear the burden of loss rather than a collecting bank. This is so despite the fact that the transaction with the collecting bank is based on a forgery.")
 
 
 [13]
 See Federal Ins. Co. v. First Nat'l Bank of Boston, 633 F.2d 978, 982 (1st Cir.1980) (applying the policy of § 3-405 to fact situation not directly covered by § 3-405)
 
 
 [14]
 We note that counsel for the Estate stated in the notice of related cases filed in the Lewis case that both the Estate's case and Lewis's cases involved checks written to "fictitious-payees," and stated in Appellants' Opening Brief that both cases involved "(apparently non-existent) payees." However, in reviewing a grant of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), we look only to the facts alleged in the pleadings
 
 
 [15]
 The treatment of this case would likely be simplified by revised Cal. Com.Code § 3404, which extends the impostor defense to situations where the impostor impersonates "the payee of the instrument or a person authorized to act for the payee." Cal. Com.Code § 3404(a) (West Supp.1995); see also Cal. Com.Code § 3404 cmt. 1 (West Supp.1995)
 
 
 [16]
 One commentator suggest that a remitter should be able to sue a bank for conversion if it cashes a check that has been stolen "directly from the remitter." Maggs at 654. However, "[i]f the remitter negotiates the check to the payee or transfers it to someone else, the remitter gives up ownership in the instrument. As a result, if the bank pays the check to the wrong person, the remitter may not recover for conversion." Id. at 654-55 (emphasis added). In the case at bar, MacLeod and Lewis transferred their teller's and cashier's checks to the messengers sent by "Yeleti" and "Singerman," and thus, even following Professor Maggs' recommended approach, lost their property right in the checks
 
 
 [17]
 We note that the Estate does not argue on appeal that the district court improperly dismissed its claims against Glendale arising out of its payment of these personal checks
 
 
 [18]
 See also Cal. Com.Code § 4205 cmt. 1 (West 1964) ("[Subdivision (1) ] is in accord with the rule that where an intended payee actually receives the proceeds, the drawer cannot recover from the payor."); Security State Bank v. Baty, 439 F.2d 910, 912 (10th Cir.1971) (holding that a bank was a holder in due course even though payee was "Floyd Park" and bank supplied indorsement reading "Floyd Park, Jr."); Segel v. First State Bank of Miami, 432 So.2d 1378, 1380-81 (Fl.Ct.App.1983) (citing Blackmon and holding that "there is no liability on the part of the drawee bank ... for paying a check on a faulty or improper endorsement or even without endorsement if the drawee bank establishes that the intended payee received the proceeds of the check")
 
 
 [19]
 This is described by the comments as the "general rule," rather than as a revision of previous law. Uniform Commercial Code § 3-110 cmt. 1 (1992)